Charleston.

PATRICK *et al. v.* DRYDEN *et al.*

(Absent, JOHNSON, JUDGE.)

Decided May 1, 1877.

1877.
January Term.

1. After the decision of a *caveat,* upon the merits, in favor of the caveatees, the caveatees obtain a patent for the land. And a *supersedeas* being awarded to the judgment on petition of the caveators, the caveatees rely on the patent as sufficient cause to dismiss the *supersedeas.* HELD:

Notwithstanding the emanation of the patent, the court should examine into the correctness of the judgment; and if the court should affirm the judgment, that is the end of the case generally, at law and in equity. But if the court should reverse the judgment, then a dismission of the *caveat* must ensue, without prejudice to the caveators in equity.

2. In a case of *caveat,* the *caveat* rests upon the ground of the better right in the caveator to the land surveyed. Unless he can show such better right, the caveatee is entitled to the judgment, though it might appear that as against a party showing a right, his entry and survey were defective, or his title insufficient.

3. When a patent is issued in pursuance of the act of 1788 (2 Rev. Code, 434), which includes in its general courses, prior claims which are named in the patent, it does not pass to the patentee the title of the commonwealth in and to the lands owned by such prior claims, subject only to the title, whatever it may be, in the prior claimant; but if that title is only a prior entry, and becomes vacated by neglect to survey and return the plat, any one may lay a warrant on the same as in other cases of vacant and unappropriated lands.

1877.
January Term.

Patrick *et al.*
v.
Dryden *et al.*

This was a proceeding upon a *caveat* entered in the circuit court of Kanawha county, in which Spicer Patrick, James H. Rogers, and others were caveators, and John Dryden and William A. McMullin, were caveatees. There was a judgment in favor of the caveatees, rendered by said court on the 16th day of April, 1869.

An appeal was granted, to operate as a *supersedeas*, upon the petition of the caveators.

The material facts are fully set forth in the opinion of Haymond, Judge.

*S. A. Miller and William A. Quarrier*, for plaintiffs in error.

*T. B. Swann*, for defendants in error.

HAYMOND, JUDGE, delivered the opinion of the Court.

This is a *caveat* case. The *caveat* seems to have been filed in the clerk's office of the circuit court of Kanawha county, on the 1st day of January, 1855, and was filed in the Virginia land office on the 26th day of December, 1854. The caveatees are John Dryden and W. A. McMullin. The *caveat* was filed by the caveators to prevent a grant issuing by the commonwealth of Virginia to the cavatees upon a survey of three hundred and twelve and a half acres of land, made for the caveatees on the 13th day of July, 1854, lying and being in Kanawha county, on Wilson's Furnace hollow, a northeast branch of Kanawha river, and Two Mile creek of Elk river, adjoining a survey of four hundred and seventy-seven acres, made for William Walker, and two other surveys, one for two hundred acres, surveyed for David Baker, also two hundred acres, surveyed for Daniel Ruffner, which survey of three hundred and twelve and a half acres is founded upon an entry made the 1st day of June, 1854, on part of land office treasury warrant for one thousand acres, numbered twenty-two thousand two

hundred and eighty-two, dated the 19th day of May, 1854, issued to the said John Dryden, who assigned five hundred acres thereof to the said William A. McMullin, among other reasons for the reason substantially, that caveators claim a better right to the said three hundred and twelve and one-half acres of land, because the same was granted by the commonwealth of Virginia to John Steele, by patent, bearing date on the 10th day of November, 1796, and the caveators claim, and hold said land by title, legal and equitable derived from said John Steele. The caveators also state specifically, the claim of title, legal and equitable under which they claim to connect themselves with the said Steele grant, and to be entitled thereto, and aver that they, or a part of them have been in the possession and occupancy and enjoyment of the said three hundred and twelve and one-half acres of land for more than thirty-four years holding the same under their claim of title in said *caveat* mentioned and described. On the 5th day of June, 1855, the caveators and caveatees appeared in court, by their attorneys, and by consent of parties, the court ordered and directed the surveyor of the county of Kanawha to go upon the land in controversy, and after notice, &c., to do such surveying as either of the parties should require. The surveyor, Abel P. Sinnett, executed the order of survey in 1855, and returned his report with plats of his work to the clerk. Afterwards, on the 7th day of November, 1856, the parties again came by their attorneys, and the court thereupon caused a jury to be elected, impanneled, and sworn well and truly to ascertain any material facts in this cause, not agreed by the parties. Whereupon the parties agreed substantially to the following facts : that a patent issued to John Steele in the words and figures following :

"*Robert Brooke, Esq., governor of the commonwealth of Virginia :*

" To all to whom these presents come, greeting : Know ye, that by virtue of a land office treasury warrant,

number nine hundred and seven, issued the 1st day of December, 1794, there is granted by the said commonwealth unto John Steele, a certain tract or parcel of land, containing twenty-seven thousand acres, by survey, bearing date the 12th day of March, 1795, lying and being in the county of Kanawha, on the northeast side of the Kanawha river, between Elk river and Kelly's creek, and is bounded as followeth, to-wit: Beginning at a sugar tree and red oak on the bank of Elk river, at the upper side of the mouth of a branch, a little above and opposite the mouth of Magazine branch, and about one mile up Elk river from its mouth; thence up Elk, with its different meanders and winding therewith, two thousand, one hundred and thirteen poles to a black oak and beech on the bank of the river; south thirty-seven degrees, east two thousand one hundred and forty poles to a post in a line of Jacob Skiles' survey of forty thousand acres; thence with his lines south forty-five degrees, west five hundred and twenty poles to a white oak and hickory, south sixty degrees east one hundred and sixty poles to a beech and gum, south thirty degrees east two hundred poles to a white oak and poplar, south twenty degrees east eighty poles to a sugar tree and beech, south forty-one degrees east five hundred and twenty poles to two beeches, south twenty-nine degrees east one hundred and thirty-two poles to two beeches, south thirty degrees west eighty poles to a cucumber tree, on the waters of Campbell's creek, south twenty-five degrees east one hundred and eighty poles to two beeches and a white oak; thence leaving Skiles' lines and running south four degrees east three hundred and sixty eight poles to two white oaks, corner to William Morris, and with his lines south twenty-seven degrees west two hundred and forty-five poles to a black oak and white oak, south seventy-five degrees west two hundred and forty-five poles to a black oak; thence leaving Morris' lines and running south sixty-nine degrees west one hundred and fifty-four poles to a

1877.
January Term.

Patrick et al.
v.
Dryden et al.

sycamore and white walnut on the bank of Kanawha river, corner to Joseph Carroll's land; thence with his lines west twenty degrees east twenty poles to a beech and sugar tree on the point of the hill, at the lower side of the Mill branch, south fifty-two degrees west three hundred and twenty-two poles to a buckeye, south fifty-four degrees west five hundred and ten poles to a hickory and dogwood, corner to Joseph Carroll; thence north forty-eight degrees west one thousand six hundred and fifty poles, down back of Harriman and Dickinson's surveys to two beeches; thence north five degrees east nine hundred and twenty poles, passing a beech and ash, corner to George Alderson, at five hundred and sixty poles to a beech; thence north eighty-five degrees west one hundred and fifty poles to a sycamore and black oak, corner to said Alderson, standing on the bank of Kanawha river; thence down the river north twenty degrees west one hundred and forty-six poles to the mouth of Campbell's creek; north thirty-nine degrees west forty-six poles to a beech and ash tree opposite the house of Colonel Donnally, supposed to be corner to John Dickinson's land; thence north fifty-one degrees west one thousand one hundred and eighty poles to the beginning.

"But it is always to be understood that the survey upon which this grant is founded, thirteen thousand, five hundred and fifty-seven acres, the property of sundry persons, viz: two hundred acres surveyed for Archer Mathews, six miles up Elk, on the southeast side of the river; also for Matthews one hundred acres opposite Griffith's land, on the northwest side; William Arbuckle, one hundred and fifty acres, four miles up Elk, on the southeast side, surveyed in 1785; Martin Hawkins and Reuben Slaughter two thousand acres joining the land where Joseph Carroll lives; James Strand, three hundred and forty acres on Two Mile creek, up Elk; Thomas Alderson one hundred acres, on said Two Mile creek, joining Strand; Shadzack Harriman, one hundred and forty and

one hundred and twenty-seven acres, on Campbell's creek; Wm. Wilson one hundred and eighty acres, on Campbell's creek; George Alderson, one hundred and fifty acres, on Campbell's creek; Samuel Brown, one thousand acres, on Campbell's creek; John Dickerson, five hundred and two acres on Kanawha river, including the mouth of Campbell's creek and the Salt spring; Nelson Hacket, one hundred and twenty and one hundred and ninety-three acres, on Witcher's creek; John Crenshaw, one thousand acres, on said Witcher's creek; William Walker, four hundred and seventy-seven and seven hundred and seventy acres, on Two Mile creek and some of the waters of Kanawha river; also one hundred and twelve acres on Elk river, opposite Cooper's place; David Reece, one hundred and ninety-three acres, on Elk, joining back of Col. Clendenin's land where he lives; Wm. Hogan two hundred and eighteen acres, on Two Mile creek, and one hundred and fifty acres on Campbell's creek, all surveyed before the year 1790; Jacob Skiles, four hundred and twenty acres, opposite Priors, on the hill; William Price, one thousand acres, joining on Witcher's creek and Carroll's land, surveyed 1790; entries are two hundred acres for Michael Lee, opposite where Col. Donnally lives, on Kanawha river; Geo. Alderson, two hundred acres, on Two Mile creek, joining Strand's land; Alexander Welch, one hundred acres, on the first creek below Campbell's creek; Alderson and Harrison, four hundred acres, joining their land where they live, also two hundred acres on the Two Mile creek, all entered before the year 1794, and eight hundred and sixty-one acres of other claims, not here inserted (exclusive of the above quantity of twenty-seven thousand acres), all of which having preference by law to the warrant and rights upon which this grant is founded, liberty is reserved that the same shall be firm and valid, and may be carried into grant or grants, and this grant shall be no bar in either law or equity to the confirmation of the titles to the same, as before mentioned and reserved, with its appurtenances.

"To have and hold the said tract or parcel of land, with its appurtenances, to the said John Steele (except as before excepted), and his heirs forever. In witness whereof, the said Robert Brooke, Esq., governor of the commonwealth of Virginia, has hereunto set his hand, and caused the lesser seal of the said commonwealth to be affixed, at Richmond, on the 10th day of November, in the year of our Lord 1796, and of the commonwealth the twenty-first.

"[Signed]   ROBERT BROOKE."

Also, that the land in controversy in this suit is within the bounds of said patent; that the said John Steele, by deed, dated the 16th day of August, 1816, conveyed an undivided third part of said twenty-seven thousand acres to Archibald Blair. And on the same day, the said Steele conveyed another undivided third part of said twenty-seven thousand acres to Elizabeth J. Carrington, Mary W. Marshall, Lucy N. Call and Ann Fisher; that on the 11th day of November, 1816, John Steele conveyed one undivided third part of the remaining third to William Steele, by deed. The parties further agreed that the said John Steele, by will, dated on the 31st day of December, 1818, devised one-half of his remaining interest in said twenty-seven thousand acres to William Steele, one-fourth thereof to Robert Steele, and the remaining fourth thereof to Jeannette Alexander, for life, remainder to her children in fee; that on the 20th day of October, 1818, John Marshall and Mary, his wife, George Fisher and Ann, his wife, Daniel Call and Lucy N., his wife, and Elizabeth J. Carrington (the said Mary, Ann, Lucy and Elizabeth J. being the same parties named in the above deed of John Steele, of the 16th of August, 1816), conveyed their interest in said twenty-seven thousand acres to William Tompkins, by deed; that on the 10th day of March, 1847, Beverly Blair and Ann B., his wife, and Archibald Blair and Lavinia, his wife, executed a deed to William Tompkins for an undi-

vided third part of said lands; that on the 25th day of March, 1820, said Tompkins and Andrew Donnally, John Reynolds, and William Steele, for himself and purporting to act for Robert Steele, and Jeannette Alexander, executed a deed of agreement and partition; that on the 10th day of March, 1829, Robert Steele conveyed his interest in said twenty-seven thousand acres to James Hewitt; that on the 10th day of June, 1830, James Hewitt conveyed one undivided moiety of the interest in said land conveyed to him by Robert Steele, as aforesaid, to James S. Armstrong; that on the 1st day of October, 1839, the said James Hewitt conveyed the remaining interest held by him in said land, derived as aforesaid, from said Robert Steele, to William Dickerson and Joel Shrewsbury, by deed; that on the 1st day of January, 1842, the said Armstrong conveyed all the interest in said land held by him to said Dickerson and Shrewsbury, by deed; that on the 2d day of August, 1833, Peter Alexander and Jeannette, his wife, Robert Ruddle and Catharine, his wife, Sarah Alexander, Jane Alexander, Benjamin James and Esther, his wife, Robert McManus and Sally, his wife, through their attorney in fact, conveyed their interests to James Hewitt in said land, by deed; that on the 15th day of March, 1837, the said Hewitt conveyed the said interest to the said Dickerson and and Shrewsbury, by deed; that on the 2d day of October, 1823, William Steele, by will, devised his interest in said land to his four daughters, Jane, Agnes W., Sally and Polly, and his granddaughter, Agnes W. Steele; that on the 9th day of November, 1840, Jane Wilson conveyed her interest in said land to William Dickerson, Joel Shrewsbury, George H. Warth and Job English, by deed; that on the 3d of September, 1835, Z. White and Agnes, his wife, conveyed their interest in said lands to John D. Lewis and William D. Shrewsbury, by deed; that on the 17th day of August, 1835, Thomas H. Bradford and Sarah C., his wife conveyed their interest in said land to said Lewis and Shrewsbury,

by deed; that on —— day of September, 1835, Henry
Lamme and Mary, his wife, conveyed their interest in
said land to said Lewis and Shrewsbury, by deed.

That on·the 19th day of October, 1827, Andrew Don-
nally sold and agreed to convey to James Bream, an un-
divided moiety of one thousand five hundred acres of
land by a title bond of the above date, in the words and
figures, &c., to-wit:

### *Title Bond—Donnally to Bream.*

"Know all men by these presents, that I, Andrew Don-
nally, of the county of Kanawha, and State of Virginia,
am held firmly bound unto James Bream, of said county
and State, in'the just and full sum of $1,000, to be paid
to the said James Bream, his certain attorney, his heirs,
executors, administrators, or assigns, for the payment
whereof, well and truly to be made, I bind myself, my
heirs, executors, and administrators, firmly by these pres-
·ents.  Sealed with·my seal, this 19th day of October,
1827.

"The condition of the above obligation is such, that
whereas the above bound Andrew Donnally hath this day
sold to the said James Bream one equal half part, which
is undivided, of fifteen hundred acres of land lying and
being in the county of Kanawha, back and adjoining the
lands and salt works of James Bream, which land is a
part of a tract of twenty-seven thousand acres patented
to John Steele, deceased, but is now held, or all that part
below the Burning Spring hollow is held, by the said
Andrew Donnally, and the other half part by the heirs
of the late Colonel William Hull, Robert Steele, and
Jane Alexander, all of which will be seen by reference
to the several deeds, wills, agreements, and conveyances,
of record in Kanawha county, and that the said Andrew
Donnally hath an equitable title to the moiety of the
said fifteen hundred acres of land:

"Now, therefore, if the said Andrew Donnally, within
one year from the time he shall himself obtain a legal

title to the same land, shall make to the said Bream a good and sufficient deed of bargain and sale, with covenants of general warranty, for one equal undivided half part of fifteen hundred acres of said land, to be bounded by the upper line of the back lands of David Ruffner, thence running the whole length of said Bream's survey, extending in nearly the same direction, and with John Wilson's survey of two hundred acres, crossing the left hand fork of Bowman's hollow to the top of the ridge that divides the said left hand fork of Bowman's hollow and waters of Two Mile creek of Elk, and back with the dividing ridge between said waters and Bowman's hollow, and Two Mile creek for quantity, then this obligation to be void; else to remain in full force and virtue.

"[Signed]          A. DONNALLY.  [Seal]."

"It is also agreed, that the said title bond of Donnally to Bream is duly and properly executed; that the said James Bream, by will duly executed, dated on the 5th day of April, 1841, devised his interest in said land to his wife, Mary Bream; that said Mary Bream, by deeds duly executed and by will, the deeds respectively dated on the —— and the said will, bearing date on the 28th of February, 1844, conveyed and devised the whole of her interest in said land to Spicer Patrick and Lavinia, his wife, to Alethea Brigham and Lenora C. Rogers, to George P. Lafong and Cassandra, his wife, to Bettie W. Lovell for life, with remainder to her children and for the use of R. C. M. Lovell, Joseph and Fayette A. Lovell, in fee; that the said Lavinia, wife of the said Spicer Patrick, has departed this life, leaving children and heirs surviving her, Mary S. Patrick (who intermarried with R. C. M. Lovell), Alfred S. Patrick, Ellen M. Patrick, Sarah L. Patrick, Lavinia P. Patrick and John M. Patrick (the said Sarah, Lavinia and John being infants); that the said Andrew Donnally, by deed dated the 16th day of June, 1848, conveyed his remaining interest in said twenty-seven thousand acres of land to his

sons, Andrew F., William and Lewis F. Donnally; that the said Lewis F. Donnally, by deed dated the 9th day of July, 1851, conveyed his interest in said land to said Andrew F. Donnally and William Donnally. It is also agreed, that George Clendenin, on the 15th day of September, 1788, made an entry of two thousand acres, in the words and figures following: " George Clendenin enters two thousand acres of land, by state warrant for five thousand acres, number eighteen thousand four hundred and ninety-two, joining the survey above the mouth of Elk river, which he bought of Cuth Bullett, to begin at a white oak and red oak at the head of the bottom and to run with the open line of the same to Elk river, and to extend out for quantity.

" 15th September, 1788.

[Signed] "ABEL P. SINNETT, S. K. C."

With a marginal note endorsed on said entry in the words and figures following, viz:

" Warrant put in on 1792 ; lifted and re-entered 15th December, 1794; that the said Clendenin, on the 15th day of December, 1794, renewed his entry of two thousand acres, joining the land he now lives on, and in the words and figures following:

*George Clendenin's Renewed Entry.*

" George Clendenin renews his entry of two thousand acres —— was made, joining the land he now lives on, and back of the same, with warrant for five thousand acres, number eighteen thousand four hundred and ninety-two, dated 7th August, —83.

" *December*, 15, 1794.

" A true copy from entry book first, page thirteenth.
              " Teste :

[Signed]          " ABEL P. SINNETT, S. K. C."

That the said Clendenin made another entry of one, thousand acres on the 5th April, 1790, in the words, &c.:

*George Clendenin's One Thousand Acre Entry.*

"George Clendenin enters one thousand acres, by the above warrant of five thousand acres, to join his entry of two thousand acres, back of the land he bought of C. Bullett, April 5, 1790."

With a marginal note thereon in the words, &c. :

Marginal note.—"Six hundred acres lifted for Donnally and Prior, 16th August, 1798.

"A true copy from the original book first, page thirty-eight.

"ABEL P. SINNETT, *S. K. C.*"

That William Walker made a survey of seven hundred and seventy acres on the 8th of June, 1786, in the words, &c.:

"Surveyed for Wm. Walker, seven hundred and seventy acres of land in Greenbrier county, on Elk river, on the southeast side, about one mile from the mouth of said river, which he is entitled to by state warrant for two thousand acres, number seven thousand seven hundred and thirteen, date the 13th October, 1781, and bounded as follows, to-wit : Beginning at two red oaks on the river bank and down the river south thirty west forty poles, south sixty-five west one hundred and seventy-two poles to three lynns on the river bank, below the mouth of a branch ; then leave the river south twenty east one hundred poles to a poplar on a ridge, with fifty-eight east three hundred and forty poles to a chestnut oak, on the point of a ridge north, thirty-two east three hundred and thirty-five poles to a white oak, and thence north eighty-six west three hundred and eighty poles to the beginning.

"[Signed]       "JOHN BYRNSIDE, *D. S. G. C.*
"ALEX. WELCH, *S. G. C.*

"*June 8th,* 1786."

That the said William Walker made another survey of four hundred and seventy-seven acres, on the 8th of June, 1786, in the words, &c. :

*William Walker's Survey of Four Hundred and Seventy-seven Acres.*

"Surveyed for William Walker, four hundred and seventy-seven acres of land lying in Greenbrier county, on the waters of the first creek emptying into Elk river on the southeast side, and some of the waters of the Great Kanawha, which he is entitled to by state warrant for two thousand acres, number seven thousand seven hundred and thirteen, dated on the 13th of October, —, joining a survey of seven hundred and seventy acres made for said Walker: Beginning at a white oak, corner to same, with same south thirty-two west four hundred and thirty-five poles to a chestnut oak on point of a ridge, corner of same, and leave the same south fifty-eight east one hundred and sixty poles, to two poplars, north thirty-two east five hundred and twenty — to red oaks and beech, north sixty-eight west one hundred and eighty poles to the beginning.

[Signed]      " JOHN BYRNSIDE, *D. S., G. C.*
         "ALEXANDER WELCH, *S. G. C.*
*"June* 8, 1786."

That George Alderson entered one hundred and fifty acres of land, on the 29th of June, 1790, by entry, in the words, &c.:

*George Alderson's Entry.*

" George Alderson enters one hundred and thirty acres of land by virtue of land office warrant for one thousand acres, number one thousand four hundred and eighteen, dated 12th day of September, 1782, assigned by John Johnston, adjoining the land he now lives on, and up his Mill creek for quantity.
*"June* 29, 1790."

That Joseph Maze, for John Steele, made an entry of fifty thousand acres, on the 19th January, 1795, in the words, &c., following, to-wit:

*John Steele's Entry of Fifty Thousand Acres.*

1877.
January Term.

Patrick *et al.*
v.
Dryden *et al.*

"Joseph Maze, for John Steele, enters fifty thousand acres of land in Kanawha county, to join the upper end of a survey of forty-seven thousand acres, made for Samuel Hollingsworth, between Elk and Pocatalico, and to extend up .between said rivers for quantity, by virtue of two land office treasury warrants, one for forty thousand acres, number nine hundred and sixty, dated the 1st day. of December, 1794, and the other for ten thousand acres, number eight hundred and twenty-one, dated 31st October, 1794.

"*January* 19, 1795.

MARGINAL NOTE—"Surveyed."

*John Steele's Entry of Sixty Thousand Acres.*

"Also enters sixty thousand acres of land in Kanawha county, by virtue of two land office treasury warrants of. thirty thousand acres each, dated the 1st day of December, 1794, joining the survey of forty thousand acres entered for Jacob Skiles,. at the head of Kelly's creek, and to extend around said entry toward Elk so far as Blue creek, joining the different surveys made on said creek to the mouth thereof; thence down Elk, with the different surveys made thereon and waters thereof, to the mouth; thence up the Kanawha, with the back lines of the surveys thereon, to the mouth of Kelly's creek; thence up it to the aforesaid survey of Skiles of forty thousand acres, leaving room for all prior locations and surveys. This entry to be made in one survey, if possible; if not, in more surveys.

"*January* 19, 1795.

"Copy—Teste:

"J. THOS. DERRICK, *S. K. C.*"

It is also agreed, that the defendants, Dryden and Mc-Mullin, made two surveys dated 13th July, 1854—one for four hundred, the other for three hundred and twelve and one-half acres, in the words, &c.:

*Dryden and McMullin's Four Hundred Acre Survey.*

"*July* 13, 1854.

"Surveyed for John Dryden and Wm. A. McMullin, four hundred acres of land in Kanawha county, on the northeast side of Kanawha river, above and adjoining a survey of three hundred and twelve and one-half acres, made for Dryden and McMullin, back of and adjoining a survey of two hundred acres made for Abram Baker, by virtue of an entry made 1st day of June, 1854, on part of a land office treasury warrant for one thousand acres, number twenty-two thousand two hundred and eighty-two, dated the 19th day of May, 1854, issued to said Dryden, who assigned five hundred —— thereof to said McMullin, and bounded as followeth, viz: Beginning at a stake, corner to their survey of three hundred and twelve and one-half acres on the back line of Baker's two hundred acres; thence with said back line south fifty-four degrees east two hundred and thirty-seven poles, crossing Black Hawk hollow to two pines by large rocks on the east side of a hill on said line; thence leaving same north forty-six degrees east two hundred and seventy-two poles, crossing drains of Two Mile creek to a dogwood and pointers on a north hillside; thence north fifty-four west, crossing Baker's fork of Two Mile at two hundred and twelve poles, in all two hundred and thirty-seven poles, to pointers on a line of their survey of three hundred and twelve and one-half acres; thence with the same south forty-six degrees west two hundred and seventy-two poles, crossing two drains of Two Mile creek to the place of beginning.

"ABEL P. SINNETT, *S. K. C.*

"JOEL LEFTWICK,
"TAYLOR NUNALLY,
        "*Sworn chainmen.*"

Surveyed for John Dryden and William A. McMillin, three hundred and twelve and one-half acres of land in Kanawha county, on Wilson's Furnace hollow, a north-

east branch of Kanawha river and waters of Two Mile creek of Elk river, adjoining a survey of four hundred and seventy-seven acres made for William Walker, and two other surveys—one for two hundred acres surveyed for Abram Baker, also two hundred acres surveyed for Daniel Ruffner, by virtue of an entry made the 1st day of June, 1854, on part of a land office treasury warrant for one thousand acres, number twenty-two thousand two hundred and eighty-two, dated the 19th day of May, 1854, issued to said Dryden, who assigned five hundred acres thereof to said McMullin, and is bounded as followeth, viz.: Beginning at a stake and two dogwoods and beech pointers, on the east side of said Furnace hollow, at the intersection of the line of said four hundred and seventy-seven acres with the back line of said D. Ruffner's two hundred acres, and running thence with a line of said Walker, west thirty-three degrees east four hundred and three poles, crossing Furnace hollow and drains thereof to —— pointers on northeast hillside on said line; thence leaving said survey south forty-four degrees east one hundred and seventy-seven poles, cross- ing a drain of Two Mile creek to a dogwood and pointers on a northeast hillside near the top; thence south forty- six degrees west three hundred and six poles, crossing two drains of said Two Mile creek to a stake on the back line of the two hundred acres made for Abram Baker; thence with two lines of the same, north fifty- four degrees west fifteen poles to two white oak saplings (corner gone); thence south sixty degrees west eighty- two poles to pointers on said line, and on the back line of Daniel Ruffner's two hundred acres; thence with same, north fifty-one degrees west fifty-three poles to the place of beginning.

"ABEL P. SINNETT, S. K. C.

"JOEL LEFTRICK,
"TAYLOR NUNNALLY,
        "*Sworn chainmen.*"

We also agree, ⸺ two entries made by Dryden and McMullin, dated ⸺, in the words, &c. :

"John Dryden and William A. McMullin, by virtue of two land office treasury warrants—one for one thousand acres, number five thousand five hundred and eleven, dated the 25th day of November, 1815, issued to Wm. Dickinson, who assigned the same to said Dryden, who assigned five hundred acres thereof to said McMullin, and three hundred and fifteen acres, part of a warrant for one thousand acres, number twenty-two thousand two hundred and eighty-two, dated the 19th day of May, 1854, issued to said Dryden, who assigned five hundred acres thereof to said McMullin, enter one thousand three hundred and fifteen acres of land in Kanawha county, back of and adjoining the survey above the mouth of Elk river, which George Clendenin bought of Cuthbert Bullett, to begin at a white oak and red oak at the head of the bottom, and to run with the open line of said Bullett survey to Elk river, and to extend out for quantity. This entry is intended to cover one made by George Clendenin, the 15th day of September, 1788, and renewed, the 15th of December, 1794, for two thousand acres, or all that remained vacant of said entry—supposed to be about one thousand three hundred and fifteen acres.

"June 1, 1854.

Note—"Marginal note to said entry, three hundred and twelve and one-fourth acres, surveyed July 13, 1854; one thousand acres, number six thousand five hundred and eleven, withdrawn.

"John Dryden and William A. McMullin, by virtue of part of a land office treasury warrant for one thousand acres, number twenty-two thousand two hundred and eighty-two, dated the 19th day of May, 1854, issued to said Dryden, who assigned five hundred acres thereof to said McMullin, enter four hundred acres of land in Kanawha county; this said entry of four hundred acres to join an entry of one thousand three hundred and fifteen acres this day made by said Dryden and McMullin, back

of the Bullett survey, on the upper side, and to begin on and extend from the upper line of said one thousand three hundred and fifteen acres, up the river with the back line of the Clingman and Hoover survey to the John Wilson survey of two hundred acres, and running with the lines of the same to a chestnut oak and beech by rocks, corner thereof, and out for quantity. This entry is to cover and include the remaining portion of an entry of one thousand acres made by George Clendenin, the 5th day of April, 1790 ; six hundred acres of which was lifted this 1st day of June, 1854.

Marginal Note—"Surveyed July 13, 1854."

"We also agree — a deed from Cuthbert Bullett to Geo. Clendenin, in the words, &c., following, to-wit :

"This indenture, made this 28th day of December, in the year of our Lord 1787, between Cuthbert Bullett, of the county of Prince William, and Hellen, his wife, of the first part, and George Clendenin, of the county of Greenbrier, of the other part, witnesseth : that the said Cuthbert Bullett and Hellen, his wife, for and in consideration of the sum of five shillings, lawful money of Virginia, to them in hand paid by the said George Clendenin, the receipt whereof they do hereby acknowledge, have granted, bargained, sold, aliened, enfeoffed and confirmed, and by these presents do grant, bargain, sell, alien, enfeoff and confirm to the said George Clendenin, and his heirs forever, a certain tract or parcel of land lying and being in the county of Greenbrier, containing one thousand and thirty acres, which said tract of land was granted to Thomas Bullett by the commonwealth of Virginia, by patent, bearing date the 20th day of November, in the year of our Lord 1779, and bounded as followeth : Being situated on the east side of the Great Kanawha and south side of Elk river, in the forks of said rivers, and beginning at a sugar tree and poplar, on Elk river, and down the several courses of the same three hundred and sixty poles to a large sycamore on the point marked T B, and up the several courses of the

Great Kanawha nine hundred and twenty-eight poles to a white walnut, and leaving the river north twenty —— to a Spanish oak and white oak at the foot of a hill, northwest six hundred and seventy poles to' the beginning; with all houses, woods, ways, waters and other appurtenances therewith belonging, or in anywise appertaining. To have and to hold said tract or parcel of land, with the appurtenances, to the said George Clendenin and his heirs forever, to the only proper use and behoof of him, the said George Clendenin, and his heirs forever.

1877.
January Term.

Patrick et al.
v.
Dryden et rl.

"And the said Cuthbert Bullett doth for himself, his heirs, executors and administrators, covenant and agree to and with the said George Clendenin, his heirs and assigns forever, that he, the said Cuthbert Bullett, at the time of the sealing and delivering of this indenture, is seised of sure and indefeasible estate of inheritance in fee simple of and in the tract or parcel of land hereby conveyed, and every part thereof, and that the same now is, and forever hereafter shall remain, free and clear of and from all incumbrances and charges of what nature or kind soever made or done or suffered by him or any person claiming under him. And the said Cuthbert Bullett, and his heirs, will forever warrant and defend the said tract or parcel of land hereby conveyed, and every part thereof, to the said George Clendenin, his heirs and assigns forever, against the claim or demand of any person or persons whatsoever.

"In testimony whereof, the said Cuthbert Bullett and Hellen, his wife, have hereunto put their hands and affixed their seals, the day and year first above written.
"[Signed,]        CUTH. BULLETT, [Seal]."

This deed seems to have been attested by three witnesses, and the execution thereof proven and the deed admitted to record. I omit the certificates as to proof, for brevity. In addition to the above facts, it is also agreed, that all taxes due on the Steele tract of twenty-

seven thousand acres granted to John Steele, by patent, dated 10th November, 1796, have been paid. The surveyor's report made in the cause is as follows:

" I have, at the request of Wm. A. McMullin and the counsel for both parties to a suit, or suits, pending in the circuit court of Kanawha county, wherein Spicer Patrick and others are plaintiffs, and John Dryden and William A. McMullin are defendants, compiled the foregoing map, to be used as evidence in said suit.

"A considerable portion of the lines of the surveys laid down upon said map have been actually run and measured by me within two years past. The lines of the John Wilson two hundred acres I ran by order of court in sundry suits now pending and undetermined, and in June, 1854, at the instance of John Dryden and William A. McMullin, I ran the following lines, viz: The greater portion of the lines of two surveys in the name of William Walker, one for four hundred and seventy-seven, and the other for seven hundred and seventy acres; and also at the same time I ran the line of two surveys in the name of John Dryden and Wm. A. McMullin, one for three hundred and twelve and one-fourth acres, and the other for four hundred acres. I also at the same time ran the southeastern boundary of a survey of two hundred acres, made for Daniel Ruffner, and the northwestern portion of the Baker survey. The posts of the back line of the Baker survey from H to I, I believe I have never run; I have laid down this line according to course and distance. I also in June, 1854, ran from the point B on the bank of Elk river, at the upper end of Cox's, now John N. Clarkson's fence, and following along the base of the hill to A, the point shown to me the place where a white oak, upper out corner to a survey of one thousand and thirty acres, made for Thomas Butten, once stood. I make the line by protraction from A to B, north forty-three and one-half, west —— poles, the bearing given; north forty-five west would run from A to G. I make the bearing of the closing line of the

Steele survey of twenty-seven thousand acres from E on
Kanawha river, where should have stood a beech and
black oak, corner to same, to a red oak on Elk river at
F, north forty-eight degrees west —— poles (north six-
ty-one degrees west —— from E, poles given), would
terminate on the bank of Elk river at K. The dotted
lines A, B, C, D, E and A include the land claimed by
·defendants as the land once covered by an entry of two
thousand acres made for George Clendenin.

. "In obedience to an order of the circuit court for Kan-
awha county, made the 5th day of June, 1855, in three
several suits therein pending and undetermined, wherein
Spicer Patrick and others are plaintiffs, and John Dry-
den and Wm. A. McMullin are defendants, on *caveat*,
and same and others *v.* same defendants on *caveat*,
and Wm. D. Shrewsbury and others *v.* same defendants,
on *caveat*, a copy of which said order attends this report
marked A, I, at the request of said Patrick and others,
went to the point K, at low water, at the mouth and
lower side of Campbell's creek, and ran thence north
—— west forty-six poles to E, the point shown to me as
the place where once stood a beech and ash, corner to ·a
survey of five hundred and two acres made for John
Dickinson, and also corner to a survey of twenty-seven
thousand acres, made for John Steele; and ran thence
according to the last call of the grant to said Steele
north fifty-one degrees west seven hundred and thirty
poles to Wilson's Furnace hollow, and measured off
north sixty-seven degrees west —— poles to pointers,
corner to a survey of three hundred and twelve and one-
half acres made for John Dryden and William A. Mc-
Mullin; thence continued the course north fifty-one de-
grees west, in all one thousand three hundred and fifty-
seven poles, to the fork of Elk river at L; thence up
the river bank north seventy-six and one-half degrees
east forty-six poles, north sixty-four degrees east nine
poles and five links to a red oak stump at M, which was
shown to me as the beginning corner of the twenty-sev-

en thousand acres, course of north sixty-four degrees east continued, in all twenty-eight poles, to a red oak on the river bank at F, marked as a corner, but apparently too young for the Steele survey of twenty-seven thousand acres.

"The plaintiffs not wishing any further surveying done, I adjourned the survey until ————.

"September 28, 1855.—Pursuant to adjournment, I went to a white oak and maple standing on the southwest side of Two Mile creek, at the point N, supposed to be corner to a survey of two hundred acres made for George Alderson. I ran thence with the reverse of the calls of said two hundred acres, patented to said Alderson, north three degrees west twelve poles (north forty degrees east fifteen poles given) to a maple at O, near the mouth of a right hand fork of said creek, marked as a corner; thence south forty-three degrees east one hundred and fifty-five poles to a white oak and maple on a point at P, no corner found, (south forty-three degrees east one hundred and twenty poles given). Upon this line I found a number of marked line trees. From thence I ran south fourteen degrees east one hundred poles to a white oak and a fallen black oak at Q, the white oak plainly marked as a corner, from which I took a block. The defendants not wishing any further surveying done, I stopped surveying.

" *Remarks.*—If the red oak stump at M be the true corner of the twenty-seven thousand acres, then the line E, M, north forty-nine degrees west, is the true closing line of said survey. If the red oak at F· be the true corner, then the line E, F, north forty-eight degrees west is the true closing line of the twenty-seven thousand acres. If the bearing were to govern, the line E, L, would be the true line of said twenty-seven thousand acres.

"All of which is respectfully reported.

"[Signed]          ABEL P. SINNETT, *S. K. C.*"

The jury impanneled and sworn in the cause found

and returned their verdict, which is recited in the record as follows :

"And the jury aforesaid having fully heard the arguments of counsel, upon their oath do say that they find that the back line from A to B, as laid down on the plat filed in this cause by Abel P. Sinnett, is the back line of the Bullett survey, and that the said line A B is the base line of the Clendenin entry of two thousand acres, and that said two thousand acres is embraced within the boundaries of A, B, C, D, as laid down in said plat by Abel P. Sinnett. That they further find that the three hundred and twelve and one-fourth acres of Dryden and McMullin, caveatees, is also embraced within the aforesaid boundary, and that they do not find the possession claimed by the caveators. Whereupon the matters of law arising on the facts so agreed by the parties, as well as those found by the jury in this cause, are deferred until to-morrow."

The following is a copy of a paper filed in this cause, to-wit :

"The caveatees, Dryden and McMullin, waive the necessity of the caveators producing the copies of the several deeds, title bonds, and agreements, not filed with the papers of the cause, but referred to in the facts agreed, and admit the same as stated in said agreed facts, and that they confer the title of the patentee, John Steele, in the twenty-seven thousand acres, so far as he had title [words obliterated] caveators, as set out in the caveat, the caveatees insisting that the patent to John Steele excepted and reserved the land in controversy, so as not to pass the title thereto to him, and for which exception and reservation reference is made to the patent, entry and survey of John Steele, which are in the papers.

[Signed]  "WM. A. McMULLIN,
"JOHN DRYDEN."

"At a circuit court held for Kanawha county, at the

court house thereof, on the 16th day of April, 1869, the same day and year first herein mentioned, the *caveat* filed in this cause against the issue of a grant to said Dryden and McMullin, the caveatees, on a survey made for them, dated July 13, 1854, for three hundred and twelve and one-half acres of land (which survey and the entry on which it is made are filed in the cause), came on for final determination on the facts agreed, as well as the facts ascertained by the jury ; and after argument of counsel for and in behalf of each party, the court doth adjudge and determine the right of the cause in favor of the defendants, the said Dryden and McMullin, the caveatees, and that the *caveat* issued in this cause shall be vacated and held for naught ; that when the said caveatees shall file a copy of the *caveat* in this case, together with a copy of the plat and certificate of survey aforesaid of said caveatees for three hundred and twelve and one-half acres aforesaid in the office of the Secretary of State for West Virginia, with a copy of this order, a grant shall issue to said caveatees for the said three hundred and twelve and one-half acres of land. And it is further adjudged that said caveatees recover their costs expended in their defense in this case from the plaintiffs, the caveators in this cause."

To this judgment of the circuit court, the caveatees obtained a *supersedeas* from one of the Judges of this Court in vacation. At this term of this Court, upon the calling of this case the appellees presented and filed their petition, praying this Court to dismiss this case, because after the final judgment rendered by the circuit court therein, and before the *supersedeas* was awarded and perfected, the said William A. McMullin and John Dryden obtained from the state of West Virginia, in pursuance of law, a grant to them for the said three hundred and twelve and one-half acres of land in controversy in this case ; and they filed with their petition the said grant, as an exhibit, dated the 18th day of May, 1869, and signed by W. E. Stevenson, Governor. It appears that the

appeal with *supersedeas* was allowed on the 21st day of
October, 1873. It fully appears that the statement of
the petition as to said grant having issued between the
date of the final judgment and the granting of the appeal
with *supersedeas* is true. The first question to be deter-
mined before considering the cause upon its merits, is
whether this Court should now dismiss the appeal with
*supersedeas* for the reasons stated in said petition, and as
is therein prayed. Upon this question, we are not with-
out some authority bearing thereon. In the case of
*Guerrant v. Bagby*, 6 Munf., 160, the supreme court of
appeals of Virginia held that a *caveat* case, if it be found
by the jury, or agreed by the parties, that since the in-
stitution of the *caveat* a grant from the commonwealth
of the land in controversy has been obtained by the
caveatee, judgment ought to be entered dismissing the
*caveat;* but such judgment to be no prejudice to any
suit in chancery which the caveator may be advised to
bring to vacate the said grant, or any grant that may
issue to the caveatee in consequence of such judgment
of dismission ; the judgment on the *caveat* being in that
event not pronounced on a comparison of the respec-
tive rights of the parties. In the case of *Wilson's heirs
v. Daggs*, 8 Leigh., 681, the following appears as the
syllabus : " After the dismission of a *caveat* upon the
merits, the caveatee files in the land office a copy of the
judgment and obtains a patent. A *supersedeas* being
awarded to the judgment, the patent is relied on as a
bar. Held : notwithstanding the emanation of the
patent, the Court may examine into the correctness of the
judgment ; but if the same be reversed, then the dismission
of the *caveat* must ensue. In such case, the dismission
will be without prejudice to any proceeding which may
be instituted to vacate the patent." In that case Judge
Tucker in delivering the opinion of the Court says, at
p. 685 : "A plea of the patent would offer no bar to the
*supersedeas* in this case, seems obvious, since it neither
presents any answer to the allegation of error, nor

1877.
January Term.

Patrick *et at.*
v.
Dryden *et al.*

operates in avoidance of it. The emanation of a patent, indeed, during the pendency of a *caveat*, leads necessarily to its dismission, since, after the issue of the patent, the judgment that it shall not issue must be a vain judgment. It goes, therefore, rather to the abatement of the *caveat* than to bar the rights of the parties, and whether the Court comes to be informed of the fact by suggestion, which is the usual course or by plea (which has never been heretofore practiced, I believe, as the proceedings in *caveat* are directed to be without writing) still the operation of the proceedings is merely to terminate the *caveat* by dismission. If the judgment below is right, then Daggs, the defendant in error, is entitled to an affirmance of that judgment, which having been rendered upon the merits will be final both at law and in equity ; whereas if the *caveat* be now dismissed without affirmance, it will be without prejudice to his adversaries' proceeding in equity, since the dismission must be without prejudice. If the judgment below is wrong, then if the *supersedeas* should be dismissed, the judgment will stand in full force, and bar the caveators of all relief in equity, however erroneous it may be, and moreover Wilson's heirs will have been deprived of their unquestioned right to review and reverse the judgment, by the act of their adversary. This cannot be. The *supersedeas* then must be decided. The true course seems to be to proceed to examine the record, and to affirm or reverse, according as the judgment may appear to be right or wrong. If we affirm, there is an end to the matter. If we reverse then the farther duty devolves upon the Court of pronouncing such judgment as the circuit court should have pronounced ; and then, and not till then, the fact of the emanation of the patent will bear upon the proceedings. For as it did not occur before the judgment, the court below could not dismiss ; but as it has since occurred, it renders vain the entry of a judgment for the caveators upon the merits and an order to the register not to issue a patent to the caveatee

Our entry must then in this aspect of the case, be to dismiss the *caveat* without prejudice." This seems to be sound and reasonable doctrine, and must govern this case as an authority not only as being in point, but as correctly announcing the law in such case. I proceed now to the consideration of the merits of the case. The petition in this case contains the following assigments of errors :

" 1. That the facts found and agreed, as set out, do not show that the entry and survey of three hundred and twelve and one-half acres, claimed by the caveatees, was located upon any of the prior claims, excepted and reserved from the survey, and by the inclusive patent to John Steele, dated 10th November, 1796, for twenty-seven thousand acres, and which the jury find included within its boundaries the three hundred and twelve and one-half acres claimed by the caveatees.

" 2. That the three hundred and twelve and one-half acres entered and surveyed by the caveatees was not, at the time of said entry and survey, waste and unappropriate lands of the state of Virginia, and therefore not subject to entry as such.

" 3. That the judgment of the court on said agreed and found facts should have been for the caveators, your petitioners.

" 4. That for the above, and other errors apparent on the face of the transcript of the record, the said judgment of the 16th April, 1869, of the circuit court of Kanawha county, ought to be reviewed, annulled and reversed and judgment rendered for the caveators."

In a case of *caveat*, the *caveat* rest upon the ground of the better right in the caveator to the land surveyed. Unless he can show such better right, the caveatee is entitled to the judgment, though it might appear that as against a party showing a right, his entry and survey were objectionable. *Walton v. Hale,* 9 Gratt., 194 ; *Harper v. Baugh,* 9 Gratt., 508. It appears that the land office treasury warrant, on which said John Steele's survey was

1877.
January Term.

Patrick *et al.*
v.
Dryden *et al.*

1877.
January Term.

Patrick *et al.*
v.
Dryden *et al.*

made, was issued on the 1st day of December, 1794 and the survey on which his patent issued was made on the 12th day of March, 1795, and his patent issued for said twenty-seven thousand acres on the 10th day of November, 1796. George Clendenin made his entry of two thousand acres on the 15th day of September, 1788, and afterwards on the 15th day of December, 1794, he renewed his said entry of two thousand acres. William Walker's two surveys for seven hundred and seventy and four hundred and seventy-seven acres of land were each made on the 8th day of June, 1786. The caveatees, William A. Mullin and John. Dryden's, survey of three hundred and twelve and one-half acres of land, which is in controversy, was made on the 13th day of July, 1854. Clendenin entered his two thousand acres before the warrant issued upon which Steele's survey was made, and his patent issued. Clendenin's said two thousand acres entry was valid and good when John Steele's survey was made and give Clendenin prior right to the land embraced and covered by his entry, to that of Steele. The report of the surveyor and the finding of the jury, shows that the caveatees said three hundred and twelve and one-half acres of land is within the boundaries of the said two thousand acre entry of said Clendenin, and also the report of the surveyor shows that the said two surveys of William Walker for four hundred and seventy-seven acres and seven hundred seventy acres of land are also within the Clendenin entry for two thousand acres (except a small part of the four hundred and seventy-seven acre survey) but in no way interfere with the said three hundred and one-half acre survey of the caveatees. Deducting the aggregate amount of said Walker's survey from Clendenin's two thousand acre entry and there is seven hundred and fifty-three acres of the Clendenin entry left. The Clendenin entry, nor any part of it is excepted by name in the patent to John Steele, but, the two Walker surveys are. None of the other surveys or entries specifically named among the

excepted and reserved in said John Steele patent appear to be within the said Clendenin entry. It does not appear that there was at the date of the Steele survey, or prior thereto any entry or survey within the said Steele survey not specifically excepted in the patent to John Steele other than the Clendenin said two thousand acre entry. Now the State patent expressly declares that " it is always to be understood that the survey upon which this grant is founded, includes thirteen thousand seven hundred and fifty-seven acres, the property of sundry persons." The patent then proceeds to specify the names of quite a number of the persons who are entitled, and the number of acres to which the different persons are entitled, and then says, " and eight hundred and sixty-one acres of other claims not here inserted (exclusive of the above quantity of twenty-seven thousand acres) all of which having preference by law to the warrant and rights upon which this grant is founded, liberty is re-. served that the same shall be firm and valid, and may be carried into grant or grants, and this grant shall be no bar in either law or equity to the confirmation of the titles to the same, as before mentioned and reserved with its appurtenances. To have and to hold the said tract or parcel of land with its appurtenances to the said John Steele (excepted as before excepted) and his heirs power." Now it is clear that there are eight hundred and sixty-one acres of land included within the exterior boundary of said John Steele twenty-seven thousand acre survey, which said Steele never bought or paid for, and the owners or claimants of said eight hundred and sixty-. one acres are not specified or named in said John Steele's said patent. It seems there are some two or three hundred acres of the Clendenin entry of two thousand acres which is without the said John Steele survey of twenty-seven thousand acres, but all the residue of it is within the same. It being shown in this case that the Clendenin entry of two thousand acres, is prior in point of time to the entry or survey of

said John Steele, and that it was good and valid at the date of Steele's said survey, and prior as to right to that of Steele, and that in fact there is less than six hundred acres of it within said Steele survey, after deducting the two Walker surveys aforesaid, under the facts and circumstances in this case, it may be reasonably inferred in the absence of evidence to the contrary, that the residue of the said Clendenin entry, after deducting the amount of said two Walker surveys, which is within the said Steele twenty-seven thousand acre survey, constitutes a part of said eight hundred and sixty-one acres of land, excepted and reserved as aforesaid. It does not appear that the Clendenin entry aforesaid was ever carried into grant. The jury found the possession against the caveators, and that it was not as claimed by them. Under these circumstances and state of facts, it seems to me that their case is covered in principle by the decision of the court of appeals of Virginia, in the case of *Nichols and others v. Covey, &c.*, 4th Randolph p. 365. The syllabus of that case is "where a patent is issued in pursuance of the act of 1788 (2 Rev. Code), 434, which includes in its general courses a prior claim, it does not pass to the patentee the title of the commonwealth in and to the lands covered by such prior claim, subject *only* to the title, whatever it may be, in the prior claimant; but if that title is only a prior entry, and becomes vacated by neglect to survey and return the plat, any one may lay a warrant on the same, as in other cases of vacant and unappropriated lands." In that case Judge Coulter delivered the opinion of the Court, and he says "the question in this case is, whether a patent, issued in pursuance of the act of 1788, (2 Rev. Code, 434), which includes in its general courses a prior claim is to be considered as passing to the patentee the title of the commonwealth in and to the lands covered by such prior claim, subject *only* to the title, whatever it may be in the prior claimant; so that if that title, as in the case before us, is only a prior entry, subject to be vacated by

neglect to survey, and return the plat, as is also this case, no one can enter therefore, as in other cases of lands so becoming vacant and subject to future entry and patent; but, that the patentee of the inclusive survey, is to hold the same against all the world, save the *prior claimant,* and the particular right under which he held. In the case before us, the prior claimant forfeited the right he then claimed by, and again re-entered, survey-ed, and obtained a patent for the same land, for which the inclusive patentee has brought his ejectment, claim-ing to recover the land under his patent issued as afore-said. If any other person had a right to enter for this land after the original claim become vacated as aforesaid, it was equally competent for the original claimant, as it was for the patentee of the inclusive grant to do so. The commonwealth, although she has sold and received payment for the *warrant,* by which an entry is made, has never sold *the land* which is covered by it, until the entry is carried into grant. The warrant may at any time be withdrawn, either before or after the entry, becomes va-cant as aforesaid, and may be again applied, either in the purchase of that, or any other vacant and unappropria-ted land. No taxes can be charged for such land, until it is granted to some one by patent. Why is it then that the commonwealth shall not be at liberty to sell and receive payment for, and collect taxes on, lands included within the bounds of such patent, but reserved out of the grant, remaining unpaid for by the inclusive patentee, and for which he is in no wise chargeable for taxes? It cannot arise from any equity in the statute in his favor. He says he will not pay for it, or subject himself to pay taxes for it, because the commonwealth cannot grant it to him; and therefore he desires that it may be reserved out of his grant, and that he may pay only for the residue, and be taxed accordingly. The law in relation to surplus lands applies to cases where the patent has issued for the whole tract, and can only be extended to this case on the postulate that the whole passed; but that is the question

1877.<br>
January Term.<br>
<br>
Patrick *et al.*<br>
v.<br>
Dryden *et al.*

53

first to be decided. There may be no mistake or fraud in the surveyor in this case; no surplus land, if this prior claim is excluded; and that remedy on behalf of the commonwealth can only be applied within a given time and under particular circumstances. The law, too, under which this patent issued, was soon found to be productive of frauds, and mischiefs, and was consequently repealed; so I think a very liberal, or what might be called an equitable construction, ought not to be given to it." See also opinion of Judge Clifford in *Armstrong v. Morrill*, 14 Wallace, 143; *Scott v. Ratcliffe*, 5 Peters, 81; *Hopkins and others v. Ward and others*, 6 Munf., 38.

It seems to me this opinion of Judge Coulter announces good law, and it meets my approval. If the Clendenin entry within the twenty-seven thousand acre survey not covered by the two Walker surveys is a part of the eight hundred and sixty-one acres excepted and reserved by the patent to Steele, and did not pass thereby to said Steele, then the caveators cannot sustain their cause in this case, simply for the reason that it never passed to John Steele by virtue of his said patent, and the caveators make no claim so far as the record in this cause shows, to said three hundred and twelve and one-half acres of land, except through said John Steele. For the foregoing reasons, the said assignments of error are not well taken, and are overruled. And the said judgment of the circuit court of the county of Kanawha, rendered in this cause, on the 16th day of April, 1869, must be affirmed with costs and damages. Let leave be given to withdraw the patent filed in the cause.

JUDGMENT AFFIRMED.